**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **ADELINA M.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 19 C 5294** |
| | ) | |
| **KILOLO KIJAKAZI,** | ) | **Magistrate Judge Finnegan** |
| **Acting Commissioner of Social Security,[1]** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Plaintiff Adelina M. seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Plaintiff filed a brief arguing that the Commissioner's decision should be reversed or the case remanded.[2] The Commissioner responded with a brief in support of affirming the decision. After careful review of the record and the parties' respective arguments, the Court agrees with Plaintiff that the case must be remanded for further proceedings.

## BACKGROUND

---

[1] Acting Commissioner Kijakazi is substituted for her predecessor, Andrew M. Saul, pursuant to Fed. R. Civ. P. 25(d).

[2] Plaintiff filed a Brief in Support of Reversing the Decision of the Commissioner of Social Security (Doc. 15), which the Court construes as a motion for summary judgment. The Court likewise construes Defendant's Brief (Doc. 24) as a motion for summary judgment.

Plaintiff applied for DIB and SSI on October 10, 2014, alleging that she became disabled on September 15, 2014, due to heart problems, epilepsy, and clinical depression. (R. 216, 223, 243). Born in 1960, Plaintiff was 54 years old at the time of her application, making her a person closely approaching advanced age (age 51-54). 20 C.F.R. § 404.1563(d); 20 C.F.R. § 416.963(d). She subsequently changed age category to that of a person of advanced age (age 55 or older). 20 C.F.R. § 404.1563(e); 20 C.F.R. § 416.963(e). Plaintiff's date last insured was December 31, 2018. (R. 239). Plaintiff attended school through sixth grade and obtained her GED. (R. 702). Between 1974 and 1983, Plaintiff worked as a machine operator at a pecan company and then at a candy company. Thereafter she spent some time working as a babysitter in a private home from 1985 to 1986, and again from 1999 to 2000. Plaintiff became a counselor at the Board of Education in January 2000, and from January 2002 until September 2003, she served as a community volunteer at Loyola University. In November 2008, Plaintiff returned to her work as a private babysitter but was fired in November 2013. (R. 102, 112-13, 244). She has not engaged in any substantial gainful activity since that time.

The Social Security Administration denied Plaintiff's applications at all levels of review, and she appealed to the district court. On September 25, 2018, this Court remanded the case for further evaluation of whether Plaintiff is capable of sustaining work requiring occasional interaction with supervisors, co-workers, and the public. (R. 775-82). The Court instructed the ALJ to take the opportunity on remand to "evaluate all of Plaintiff's psychological limitations, including her complaint of panic attacks, and pose new hypothetical questions to a vocational expert as appropriate." (R. 781). The Court additionally instructed the ALJ to "explain why, in finding Plaintiff has no physical

restrictions, she afforded great weight to the opinions from two state agency physicians who do not appear to have considered Plaintiff's back pain, sciatica, and obesity." (*Id.*). The Appeals Council vacated the Commissioner's prior decision and remanded the case for a new hearing. (R. 785).

Administrative law judge Laurie Wardell (the "ALJ") held a new hearing on January 10, 2019. (R. 693). She heard testimony from Plaintiff, who was represented by counsel, and from vocational expert Sara Gibson (the "VE"). (R. 693-732). The ALJ issued a new decision on March 7, 2019. (R. 665-86). The ALJ found that Plaintiff's sciatica, obesity, epilepsy, posttraumatic stress disorder ("PTSD"), bipolar disorder, and major depressive disorder are severe impairments, but they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 672-75). After reviewing the medical and testimonial evidence, the ALJ concluded that Plaintiff retains the residual functional capacity ("RFC") to perform medium work with: frequent stooping, climbing ramps, and climbing stairs; no climbing of ladders, ropes, or scaffolds; occasional exposure to hazards; limitations to simple, routine, and repetitive tasks involving only simple work-related decisions and occasional changes in the work setting; no production-rate pace standards; brief and superficial contact with coworkers and supervisors; and no interactions with the public. (R. 675-76).

The ALJ accepted the VE's testimony that a person with Plaintiff's background and RFC cannot perform any past work but can handle other jobs that exist in significant numbers in the national economy, including Laundry Worker, Assembler, and Sorter. (R. 684-85). Accordingly, the ALJ again found that Plaintiff was not disabled at any time from the September 15, 2015 alleged disability onset date through the date of the decision.

(R. 685). The Appeals Council denied Plaintiff's request for review (R. 754-58), leaving the ALJ's decision as the final decision of the Commissioner and, therefore, reviewable by this Court under 42 U.S.C. § 405(g). *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

In support of her request for reversal or remand, Plaintiff argues that the ALJ: (1) did not adequately assess the opinion evidence of Plaintiff's treating family physician, Andi Arnautovic, M.D.; (2) did not properly evaluate Plaintiff's physical RFC; and (3) did not properly evaluate Plaintiff's subjective allegations. For the reasons discussed in this opinion, the Court finds that the ALJ failed to provide sufficient explanation for her conclusion that Plaintiff can perform medium work.

## DISCUSSION

### I.      Governing Standards

#### A.      Standard of Review

Judicial review of the Commissioner's final decision is authorized by the Social Security Act (the "SSA"). 42 U.S.C. §§ 405(g), 1383(c)(3). In reviewing this decision, the court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "'displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.'" *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making its determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). The ALJ need not, however, "'provide a complete written evaluation of every piece of testimony and evidence.'" *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (internal citations and quotation marks omitted)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B. Five-Step Inquiry

To recover DIB or SSI, a claimant must establish that she is disabled within the meaning of the Social Security Act.[3] *Shewmake v. Colvin*, No. 15 C 6734, 2016 WL 6948380, at *1 (N.D. Ill. Nov. 28, 2016). A claimant is disabled if she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to law for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, an ALJ must conduct a standard five-step inquiry, which involves analyzing: "(1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the

---

[3] Because the regulations governing DIB and SSI are substantially identical, for ease of reference, only the DIB regulations are cited herein.

claimant's impairment is one that the Commissioner considers conclusively disabling; (4) if the claimant does not have a conclusively disabling impairment, whether [s]he can perform her past relevant work; and (5) whether the claimant is capable of performing any work in the national economy."  *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (citing 20 C.F.R. § 404.1520).  If the claimant meets her burden of proof at steps one through four, the burden shifts to the Commissioner at step five.  *Moore v. Astrue*, 851 F. Supp. 2d 1131, 1139-40 (N.D. Ill. 2012).

## II.    Analysis

### A.    Opinion Evidence

Plaintiff argues that the case must be reversed or remanded because the ALJ failed to provide good reasons for declining to give controlling weight to the medical opinion provided by Plaintiff's treating physician, Dr. Andi Arnautovic, and assigning it only little weight. (Doc. 15, at 8-12).  A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record.[4]  20 C.F.R. § 404.1527(c)(2); *see Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016); *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).  If the opinion is contradicted by other evidence or is internally inconsistent, the ALJ may discount it so long as she provides an adequate explanation for doing so.  *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011); *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).  That is to say, the ALJ must offer "good reasons" for discounting a treating

---

[4]     Amendments to the Social Security regulations regarding the evaluation of medical evidence were published on January 18, 2017.  92 FR 5844-84 (Jan. 18, 2017).  Because the amendments only apply to claims filed on or after March 27, 2017, all references to the regulations in this opinion refer to the prior version.

physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, (5) whether the opinion was from a specialist, and (6) other factors brought to the attention of the ALJ.  20 C.F.R. § 404.1527(c)(2)-(6); 20 C.F.R. § 416.927(c)(2)-(6); see *Simila*, 573 F.3d at 515.

Dr. Arnautovic completed a physical medical source statement for Plaintiff on February 24, 2015 at the request of Plaintiff's counsel**.** (R. 439-42; 506).  He diagnosed hypertension, hyperlipidemia, anxiety, depression, and back pain, and indicated that Plaintiff's symptoms included palpitations, chest pain, and leg pain.  (R. 439).  Dr. Arnautovic opined that Plaintiff can walk for zero city blocks without rest, sit for 10 minutes before needing to get up, and stand for 15 minutes before needing to sit down or walk around.  (R. 440).  He concluded that Plaintiff must walk for five minutes every 60 minutes but does not require a job that permits shifting positions at will or taking unscheduled breaks.  (*Id*.).  Dr. Arnautovic further opined that Plaintiff does not need to use a cane; can rarely lift less than 10 pounds; can rarely twist, stoop, or climb ladders; and can occasionally climb stairs.  (R. 441).  In addition, Plaintiff's impairments are likely to produce "good days" and "bad days" such that she will miss work about one day per month.  (R. 442).

In giving this opinion little weight, the ALJ first explained that it was inconsistent with the medical evidence.  (R. 682).  The Court finds no error in this assessment.  Records show that Plaintiff began treating with Dr. Arnautovic on February 6, 2014, to

establish a new primary care relationship.  (R. 451).  At that initial evaluation, Plaintiff's major complaints were shortness of breath and palpitations.  (R. 450-51).  On exam, Plaintiff's breathing was normal, but Dr. Arnautovic noted that Plaintiff reported feeling shortness of breath and a racing heartbeat from time to time for the past three years.  (R. 452-53).  Accordingly, Dr. Arnautovic provided referrals for testing related to the palpitations and a referral to psychiatry for anxiety and depression.  (R. 453).  The next day Dr. Arnautovic added Lisinopril (for hypertension) and Lipitor (for hyperlipidemia) to Plaintiff's medication regimen.  (R. 457).  When Plaintiff saw Dr. Arnautovic again on June 7, 2014, she reported that she had been in Mexico for several months and had not followed up with any of the referrals he had provided, although she did start taking medications for her hypertension during that time.  (R. 462-63).  Her physical examination was normal, and her heart rate, rhythm, and sounds were normal, but Dr. Arnautovic nonetheless provided new referrals to cardiology and psychiatry.  (R. 463).

On June 21, 2014, cardiologist Sandeep Khosla, M.D. saw Plaintiff and conducted two electrocardiograms, a chest X-ray, and an echocardiogram; all tests produced normal or mild results.  (R. 374-85, 475, 1125).  During a follow-up visit with Dr. Arnautovic on July 19, 2014, Plaintiff reported she was asymptomatic and did not have any complaints or concerns.  (R. 470).  Treatment notes reflected Plaintiff was "here for follow up visit and medication refills."  (*Id.*).  During Plaintiff's next follow-up visit with Dr. Arnautovic on August 16, 2014, Plaintiff did not complain of palpitations or shortness of breath but reported experiencing "[s]tabbing like pain in both heels" that was relieved with rest.  (R. 474).  Dr. Arnautovic diagnosed Plaintiff with plantar fasciitis and prescribed ibuprofen.  (R. 475).

On September 4, 2014, Plaintiff presented to Mount Sinai Medical Center complaining of chest discomfort. Cardiologist Sandeep Khosla, M.D. tested Plaintiff's heart rhythm and noted "extremely rare" premature atrial and ventricular contractions. (R. 368-69). Myocardial perfusion imaging conducted the same day revealed a "moderate-sized, moderately severe, reversible defect involving the basal and mid anterior and basal and mid anterolateral wall(s)," but was "otherwise normal." (R. 371-72). A little over a week later, on September 15, 2014, Mukesh Singh, M.D., performed a cardiac catherization and coronary angiography on Plaintiff following a positive stress test. (R. 347, 361). The results were normal. (R. 353, 363). Plaintiff alleges that her disability began the same day. Five days later, on September 20, 2014, during another visit with Dr. Arnautovic, Plaintiff was asymptomatic and "[did] not have any complaints or concerns." (R. 479). Plaintiff told Dr. Arnautovic that she had been tested by the cardiology department and that everything was normal. (R. 479). Plaintiff saw Dr. Arnautovic again on October 22 and November 17, 2014. During each of these visits, Plaintiff again was asymptomatic and had no complaints. (R. 486, 491).

On January 20, 2015, Plaintiff first complained of a "dull and heavy" chest pain "at a severity of 7/10," which she said she had been experiencing for one week. (R. 495-96). Dr. Arnautovic noted her chest pain was a "new problem" and sent Plaintiff to the emergency room for an evaluation. (*Id.*) Plaintiff's electrocardiogram reflected "nonspecific T wave abnormality," and doctors characterized this test as an "[a]bnormal ECG" (R. 409-10), though it apparently was not serious enough to require treatment. (R. 400-33). Her heart rate and rhythm were normal, with no murmur or gallop. (R. 408). A stress test did not induce any significant electrocardiographic changes over the baseline,

and doctors noted no significant dysrhythmias. (R. 418). There also was no evidence of cardiopulmonary abnormalities, reversible ischemia, or reversible perfusion defects. (R. 419-20). In short, imaging and tests conducted by the emergency department were largely normal, and Plaintiff was discharged.

On February 23, 2015, Plaintiff first complained to Dr. Arnautovic that she was experiencing back pain that "started 1 to 4 weeks ago . . . intermittently" with pain "at a severity of 6/10" that radiated to the right knee, foot, and thigh. (R. 501). Dr. Arnautovic documented "[n]o acute findings on exam" and prescribed ibuprofen. (R. 503). One day later, Dr. Arnautovic completed the physical medical source statement for Plaintiff, in which he opined that she can sit for only 10 minutes at a time, stand for only 15 minutes at a time, walk zero city blocks, and rarely lift less than 10 pounds. (R. 439-42).

Despite these significant restrictions, in the following months, Plaintiff did not complain of either chest pain or back pain to Dr. Arnautovic.[5] On March 16, 2015, Dr. Arnautovic noted that Plaintiff's blood pressure was high and her hypertension was uncontrolled. (R. 591). Plaintiff had not been taking her medications prior to that day's appointment, and Dr. Arnautovic warned her to comply with the treatment plan. (*Id.*) Her chest and back pain, however, appear to have been under control. Plaintiff saw Dr. Arnautovic again on June 19, July 17, and October 26, 2015, for routine screenings, explanations of screening results, and medication refills. (R. 593-96, 600-02, 605-06). Plaintiff did not complain of symptoms during any of these visits.

---

[5]     In April 2015, Plaintiff told her psychiatrist she had a history of having panic attacks 1-3 times per month during which she experienced shortness of breath and chest pain. (R. 538). Subsequent treatment notes, however, said nothing about chest pain (R. 545, 552, 556, 560, 566), and Plaintiff does not challenge any of the ALJ's findings concerning her mental functioning.

Dr. Arnautovic next examined Plaintiff on November 25, 2015 for a follow-up visit after Plaintiff fell from a chair, fractured her left elbow, and was treated by the emergency department. (R. 609). On December 8, 2015, Nisbitkumar Patel, M.D., performed surgery to insert a plate and screws into Plaintiff's elbow. (R. 947-49). He told Plaintiff that the injury was "not only to the bone, but also to the joint and can have long-term consequences including . . . joint pain and stiffness, and posttraumatic arthritis." (R. 948). Dr. Arnautovic saw Plaintiff for another follow-up on January 15, 2016 and noted that she was "[d]oing well" post-surgery and needed a referral for physical therapy. (R. 614). During her next three visits with Dr. Arnautovic, Plaintiff voiced no complaints about back pain, chest pain, or difficulty walking, standing, or lifting, and was prescribed only ibuprofen for her left elbow. (R. 615-19, 622-26).

Plaintiff attended one session of occupational therapy at Schwab Rehabilitation Hospital on April 19, 2016, during which she reported not lifting over five pounds and dropping her coffee that morning when trying to hold it with her left hand. (R. 648). By this time, four months had passed since her surgery. Notes from that initial evaluation reflect that Plaintiff was unable to attend therapy immediately following surgery due to unspecified "other issues" and instead worked on improving her range of motion at home. (R. 649). This seemed to work: Plaintiff reported during the evaluation that her movement was "about 90% better now" (*id.*), and there is no evidence that she pursued additional occupational therapy.

On April 21, 2016, Plaintiff saw Dr. Arnautovic and complained of experiencing dizziness for two days with shortness of breath. (R. 629). Her physical exam results were normal, but Dr. Arnautovic noted she "appears distressed" and referred her to the

emergency department. (R. 630-31). All of the test results from the emergency department came back normal. (R. 635). On April 26, 2016, Plaintiff saw neurologist Jeffrey Yu, M.D. for a consultation regarding seizures she reported having since she was 16 years old. Plaintiff complained that the seizures occurred "at least once a year" and that she had "twitching or shaking" on her face three to four times per week, lasting a few minutes and causing blurry vision and slurred speech. (R. 655). Based on this information, Dr. Yu concluded that Plaintiff "may be having simple partial seizures" and noted he had "some suspicion that some of her seizure activity may be pseudoseizures secondary to anxiety and stress." (R. 657). Dr. Arnautovic saw Plaintiff for a follow-up visit on May 4, 2016 and provided her with referrals for her neurology follow-up appointment and an MRI. (R. 635). Dr. Yu performed an electroencephalogram ("EEG") on May 11, 2016, and reported that he was "not able to appreciate any epileptiform discharges or ictal patterns suggestive of active seizure activity during this study." (R. 568). Though Plaintiff was diagnosed with epilepsy, her treatment consisted solely of prescription medicine and sporadic medical monitoring.

After examining Plaintiff on June 17, 2016 to address her complaints of an itchy scalp (R. 639-40), Dr. Arnautovic did not see her again for over a year until September 14, 2017. Dr. Arnautovic noted that Plaintiff had gone to the emergency department for knee pain after she fell two weeks earlier. X-rays were normal and the pain had improved significantly though it was not fully resolved. (R. 996-97). Dr. Arnautovic prescribed ibuprofen and topical capsaicin. (*Id.*) This appears to have solved the problem; Plaintiff did not complain of knee pain during any appointments after this date.

On April 23, 2018, Plaintiff saw Keisha House, N.P., a nurse practitioner with Dr. Arnautovic's practice, and complained of dizziness, unstable balance, and sensitivity to light.  Nurse House prescribed meclizine (an antihistamine).  (R. 1083).  A few months later, on July 30, 2018, Dr. Arnautovic conducted an annual physical examination, and Plaintiff again had no complaints or concerns.  (R. 1098, 1166).  She requested an ophthalmology referral, and Dr. Arnautovic provided one.  (R. 1094).  On September 27, 2018, Plaintiff complained of pain in her left eye, and Nurse House instructed her to go to the emergency department for further treatment.  (R. 1108-09).

Finally, on October 2, 2018, Plaintiff was examined by Mir Yadullahi, M.D., for a neurology consult.  (R. 907).  Notes from that visit indicate that Dr. Yadullahi had examined Plaintiff in July 2017 but the record does not contain any related treatment notes.  Dr. Yadullahi found no abnormal results other than Plaintiff's own reported episodes of tremors when anxious or stressed.  (*Id.*).  She said she had not experienced a seizure since her last visit.  (R. 908).  Dr. Yadullahi instructed her to continue her carbamazepine regimen.  (*Id.*).

Based on all of this evidence, the ALJ reasonably concluded that Plaintiff's "mostly normal" physical examinations, sporadic complaints of chest pain and dizziness, unsubstantiated complaints of seizures, and intermittent back pain treated with nothing more than ibuprofen, were inconsistent with Dr. Arnautovic's opinion that Plaintiff essentially cannot work.  (R. 682).  Plaintiff fails to explain how the medical records demonstrate that she had multiple seizures per week or cite to specific records showing that she suffers from debilitating back and chest pain that renders her largely incapable of sitting, walking, standing, and lifting.  Instead, Plaintiff objects that the ALJ erred by

citing generally to three exhibits, 5F, 9F, and 11F, totaling 154 pages. (Doc. 15, at 11). As discussed, however, those notes show that Plaintiff's physical examinations, particularly with respect to her musculoskeletal indications, were consistently normal. (R. 452, 630, 1085, 1166, 1198). Since the ALJ clearly considered all of these records, and they undermine Dr. Arnautovic's opinion, the citation to full exhibits is not a basis for remanding the case.

Plaintiff next argues that the ALJ failed to properly consider the fact that Dr. Arnautovic had a longitudinal view of her impairments and functioning. (Doc. 15, at 9-10). To the contrary, the ALJ expressly acknowledged Dr. Arnautovic's "longitudinal treating history" with Plaintiff, which gave him "many opportunities to observe [Plaintiff's] physical functioning." (R. 682). But the ALJ also noted that Dr. Arnautovic provided his opinion on February 24, 2015, "shortly after the [September 15, 2014] alleged onset date" and so his findings did not incorporate some four years of additional treatment records. (*Id*.). Plaintiff insists this, too, was an error because there is no evidence in the record that her condition improved in those subsequent years. (Doc. 15, at 10-11). The flaw in this argument is that the treatment notes generally show that Plaintiff's chest pain and back pain were controlled with nothing more than ibuprofen. In fact, in the nearly four years following Dr. Arnautovic's opinion, Plaintiff never again mentioned back pain, and her exams regularly documented normal musculoskeletal functioning. (R. 452, 630, 1085, 1166, 1198). Plaintiff similarly did not complain of chest pain after February 2015 (aside from once in April 2015 in connection with panic attacks), and all cardiology testing was normal. As for Plaintiff's elbow, she reported feeling "about 90% better" in April 2016

following surgery with only minimal home exercises, and her seizures (the apparent cause of the elbow fracture) were largely controlled with medication.

Plaintiff objects that the ALJ still erred by discounting Dr. Arnautovic's opinion because it was "quite conclusory, on a 'check box' form." (R. 682). Plaintiff contends that "the format of the report filled out by the clinician dictates the type of response that the clinician gives." (Doc. 15, at 10; Doc. 27, at 7). That may be, but "[t]he Seventh Circuit has characterized [a] check-box form with no supporting narrative as 'weak evidence' when the findings are inconsistent with the medical record." *Kinnari A. v. Saul*, No. 19 C 760, 2020 WL 1863291, at *8 (N.D. Ill. Apr. 14, 2020) (citing *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)). Dr. Arnautovic provided no supporting narrative for the functional limitations he imposed and, as discussed, they were inconsistent with the medical records. Plaintiff argues that the ALJ should have recontacted the doctor to get additional information and flesh out his opinion. (Doc. 15, at 10; Doc. 27, at 7). But it is well-established that "[a]n ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, Dr. Arnautovic's own clinical observations and other medical evidence of record contradict his opinion, including normal exams, consistently normal musculoskeletal appearances (range of motion, strength, and gait), Plaintiff's intermittent complaints of pain, and evidence of alleviation of any pain with ibuprofen. In such circumstances, the ALJ did not err in failing to recontact Dr. Arnautovic before giving his opinion little weight.

Plaintiff finally argues that the ALJ should not have rejected Dr. Arnautovic's opinion that she can sit for only 10 minutes at a time based on her ability to sit through

the 47-minute administrative hearing. Plaintiff stresses that sitting through such a hearing is very different from sitting at work. (Doc. 15, at 10; Doc. 27, at 8-9). True, but Plaintiff's ability to sit over four times longer than claimed, combined with the many inconsistencies between Dr. Arnautovic's opinion and the medical evidence (generally normal examinations, on and off pain that was controlled with ibuprofen, and normal test results following any complaints of symptoms), supports the ALJ's decision to give the opinion little weight. *Jones v. Barnhart*, 55 F. App'x 382, 385 (7th Cir. 2003) (an ALJ may discount an opinion that is "contradicted by the claimant's actual functioning.").

Viewing the record as a whole, the ALJ's decision to afford only little weight to Dr. Arnautovic's opinion is supported by substantial evidence. "As the Supreme Court observed fairly recently, substantial evidence is not a high standard, and requires only evidence that 'a reasonable mind might accept as adequate.'" *Richard C. v. Saul*, No. 19 C 50013, 2020 WL 1139244, at *5 (N.D. Ill. Mar. 9, 2020) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019)). For the reasons stated, the ALJ's decision more than satisfies that test. Plaintiff's request to remand the case for further discussion of this issue is denied.

### B. Physical RFC

Plaintiff also argues that the case must be reversed or remanded because the ALJ erred in finding that she has a physical RFC for medium work. (Doc. 15, at 3-8). A claimant's RFC is the maximum work that she can perform despite any limitations. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 WL 374184, at *2. "Although the responsibility for the RFC assessment belongs to the ALJ, not a physician, an ALJ cannot construct his own RFC finding without a proper medical ground and must explain how he

has reached his conclusions." *Amey v. Astrue*, No. 09 C 2712, 2012 WL 366522, at *13 (N.D. Ill. Feb. 2, 2012).

The ALJ found that despite suffering from the severe impairments of sciatica, obesity, and epilepsy, Plaintiff retains the physical RFC to perform medium work, except that she can frequently stoop, climb ramps, and climb stairs; never climb ladders, ropes, or scaffolds; and tolerate occasional exposure to hazards. (R. 671, 675-76, 679). Medium work requires the ability to lift 50 pounds occasionally and 25 pounds frequently, and sit, stand, and walk for up to 6 hours in an 8-hour workday. 20 C.F.R. § 404.1567(c); *see also Phillips v. Astrue*, 601 F. Supp. 2d 1020, 1029 (N.D. Ill. 2009).

Plaintiff argues that the ALJ failed to build a logical bridge between the evidence of record and this RFC. She first objects that the restriction to no climbing of ladders, ropes, or scaffolds and only occasional exposure to hazards does not adequately account for her seizure activity. Plaintiff testified that she experiences tremors and shakiness in her face three to four times a week (R. 708-09) and reported having seizures three to four times a week, even when on her medication. (R. 710). The ALJ reasonably concluded, however, that this testimony was not consistent with the medical record. (R. 676).

In November 2015, Plaintiff experienced a seizure, fell off her chair, and fractured her left elbow requiring surgery in December 2015. (R. 552-54, 948-49). Four months later, on April 21, 2016, Plaintiff complained to Dr. Arnautovic of dizziness and shortness of breath. (R. 627-31). At an appointment with neurologist Dr. Yu on April 26, 2016, Plaintiff reported that her seizures occurred "at least once a year" and that she had "twitching or shaking" on her face three to four times per week, lasting a few minutes and causing blurry vision and slurred speech. (R. 655). Dr. Yu concluded that Plaintiff "may

be having simple partial seizures" but noted he had "some suspicion that some of her seizure activity may be pseudoseizures secondary to anxiety and stress." (R. 657). Dr. Yu performed an EEG test on May 11, 2016 that was unremarkable and did not reveal any seizure activity. (R. 568). More than two years later, on October 2018, Plaintiff told Dr. Yudallahi that she had not experienced a seizure since her last visit in July 2017, and he instructed her to continue her carbamazepine regimen. (R. 908).

Plaintiff fails to explain how this treatment history, consisting solely of prescription medicine and sporadic monitoring, demonstrates that she had multiple seizures per week. Nor does she identify any physician who indicated that her seizure activity necessitated greater restrictions than those set forth in the RFC. Plaintiff's mere speculation that she may have been off-task for more than 15% of the workday as a result of her seizures finds no support in the record and is not a basis for remanding the ALJ's decision. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016) (a claimant is not entitled to a remand if she does not "identify medical evidence that would justify further restrictions" than those set forth in the RFC).

Closer scrutiny is required of the ALJ's conclusion that Plaintiff can perform the lifting requirements of medium work. As discussed, the ALJ reasonably rejected Dr. Arnautovic's opinion that Plaintiff can stand, sit, and walk for no more than 2 hours in an 8-hour workday; lift no more than 10 pounds; rarely twist, stoop, and climb ladders; and sit for no more than 10 minutes at a time, since the opinion was offered shortly after the alleged onset date and was inconsistent with the medical evidence of record. (R. 439-43, 682). The ALJ also afforded little weight to the opinions from State agency consultants Gerald Klyop, M.D. (November 28, 2014), and Prasad Kareti, M.D. (October 23, 2015),

that Plaintiff has no severe physical impairments at all and so has no associated limitations, explaining that the State agency physicians did not adequately consider the combined effect of Plaintiff's physical conditions and did not have access to newer treatment records from November 2015 forward.  (R. 97, 108, 122-23, 134-35, 683).  Plaintiff contends that by discounting all of these medical opinions, the ALJ "created an evidentiary deficit she filled with her own lay opinion."  (Doc. 15, at 4).

It is well-established that an ALJ is not required to rely entirely on a particular medical opinion or choose between the opinions.  *Schmidt*, 496 F.3d at 845.  That said, the ALJ "cannot reject all the relevant medical RFC opinions and then construct a middle ground and come up with her own physical RFC assessment without logically connecting the evidence to the RFC findings."  *Mark J. v. Saul*, No. 18 C 8479, 2020 WL 374676, at *5 (N.D. Ill. Jan. 23, 2020) (internal quotations and alterations omitted); *see also Clifford v. Apfel*, 227 F. 3d 863, 870 (7th Cir. 2000) ("[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record."); *Manuel C. v. Kijakazi*, No. 19 C 5398, 2021 WL 3633956, at *4 (N.D. Ill. Aug. 17, 2021) (ALJ is not permitted to "fashion[] a compromise RFC").

Here, the ALJ cited records showing that Plaintiff has "age-appropriate or only slightly diminished strength, range of motion, coordination, sensation, reflexes, and musculoskeletal appearances in her lower back and lower extremities throughout her period of alleged disability," and explained that "there is little evidence of sustained loss of ambulatory endurance, imbalance, or gait dysfunction that required a prescription for an assistive device."  (R. 678).  The ALJ did not, however, demonstrate how these findings logically connect to a conclusion that Plaintiff—a 54-year-old woman as of the alleged

onset date with sciatica and obesity—can occasionally lift 50 pounds. In fact, the ALJ makes no specific mention of Plaintiff's lifting capabilities at all aside from stating generally that she has an RFC for medium work.[6] *See Juanona N. v. Saul*, No. 19 C 4110, 2021 WL 1614504, at *8 (N.D. Ill. Apr. 26, 2021) (no "self-evident link" between findings that plaintiff has normal range of motion and strength and conclusion that plaintiff, "a 50-year-old woman with degenerative disc disease who was 5 feet and 3 inches tall – could occasionally lift 50 pounds as opposed, say, to 40 or 30 pounds.").

Absent an obvious connection between the evidence and Plaintiff's ability to occasionally lift 50 pounds, the Court cannot discern whether the ALJ had a logical explanation for this finding, or simply split the difference between the opinions of record. The latter approach is improper because "ALJs are not permitted to construct a 'middle ground' RFC without a proper medical basis." *Juanona N.*, 2021 WL 1614504, at *9 (quoting *Norris v. Astrue*, 776 F. Supp. 2d 616, 637 (N.D. Ill. 2011)). *See also Manuel C.*, 2021 WL 3633956, at *5 (remanding where the ALJ "failed to construct the requisite accurate and logical bridge from the evidence to the ALJ's 'middle ground' physical RFC"); *Marianne T. v. Saul*, No. 19 C 6171, 2021 WL 1088322, at *4 (N.D. Ill. Mar. 22, 2021) (same). The ALJ needed to articulate in at least minimal form what led to the conclusion that Plaintiff can occasionally lift 50 pounds and frequently lift 25 pounds, and her failure to do so constitutes reversible error. This error cannot be viewed as harmless because a person with Plaintiff's education and background who was limited to light as opposed to medium work would have been deemed disabled under the Medical-Vocational

---

[6] During the hearing, the ALJ questioned Plaintiff about the lifting requirements of her previous babysitting jobs (R. 703-04) but ultimately did not address Plaintiff's lifting capabilities in the decision.

Guidelines as of her 55th birthday (March 23, 2015). 20 C.F.R. Part 404, Subpart P, Appendix 2.

Viewing the record as a whole, the ALJ did not adequately explain her conclusion that Plaintiff is capable of performing medium work, and the case must be remanded for further consideration of this issue. *See Scott*, 647 F.3d at 740 (remanding where the ALJ failed to identify any medical evidence to substantiate her belief that the claimant was capable of meeting standing and lifting requirements).

### C.    Plaintiff's Subjective Statements

The Court does not find any specific error with respect to the ALJ's evaluation of Plaintiff's subjective statements regarding her limitations. However, the ALJ should take the opportunity on remand to reconsider Plaintiff's testimony regarding her lifting abilities and explain her decision to credit or reject those statements in determining the RFC.

### <u>CONCLUSION</u>

For these reasons, Plaintiff's motion for summary judgment (Doc. 15) is granted, and the Commissioner's motion for summary judgment (Doc. 24) is denied. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTER:

Dated:  February 8, 2022

SHEILA FINNEGAN
United States Magistrate Judge

21